# In the United States Court of Federal Claims

Case No. 08-221C
(**Corrected Version noting the "Of Counsel" for GSA –** Filed: July 24, 2008)
TO BE PUBLISHED

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * * | * | |
| **CAPITOL SUPPLY, INC.,** *Plaintiff,* | * | Post-award bid protest; Blanket Purchase Agreement; Request for Quotation; FAR Part 8.4; Judgment on the administrative record pursuant to RCFC 52.1; Motion to supplement the administrative record; Agency discretion; Rational basis; Rejection of nonresponsive quotation. |
| v. | * | |
| **THE UNITED STATES OF AMERICA,** *Defendant.* | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * * | * | |

***Holly A. Roth***, Washington, D.C., for Plaintiff. ***Jon van Horne***, Of Counsel.

***Steven M. Mager***, U.S. Department of Justice, Washington, D.C., for Defendant. With him on the briefs were ***Gregory G. Katsas***, Acting Assistant Attorney General, ***Jeanne E. Davidson***, Director, and ***Harold D. Lester, Jr.***, Assistant Director. ***Kacie A. Haberly***, Senior Assistant General Counsel, General Services Administration, Of Counsel.

***John Bergen***, Law Clerk.

***Pasha Majdi***, Intern.

## OPINION & ORDER

**BASKIR**, Judge.

This case is a post-award bid protest involving the procurement of office supplies under Blanket Purchase Agreements (BPA) offered by the U.S. General Services Administration (GSA). The plaintiff, Capitol Supply, Inc. (Capitol Supply), alleges that the GSA refused to evaluate its quotation and award it a BPA based on the erroneous determination that its pricing information was improperly submitted. We reject the plaintiff's arguments. **For the reasons stated below, we DENY Plaintiff's motion for judgment on the administrative record and GRANT the defendant's cross-motion.**

## BACKGROUND

With some notable exceptions we discuss below, the facts bearing on this case are undisputed.

The Agency's Request for Quotations

Beginning in 2006, GSA facilitated a multi-agency team to establish BPAs for the purchase of office supplies from the Federal Supply Schedule (FSS). GSA FSSI Technical Plan for Office Supplies (Jan. 10, 2006) (Administrative Record (AR) 254). The purpose of the BPA is to streamline the Government's acquisition process in order to reduce costs while maintaining or improving service levels and meeting other government objectives. *Id*.

On February 6, 2007, GSA issued Request For Quotations (RFQ) No. 189760 through a posting on GSA e-Buy. RFQ (AR 274). The RFQ was open to all FSS vendors awarded Special Item Number 75 200 Office Products under GSA Schedule 75 – Office Products/Supplies and Services and New Products/Technology. GSA BPA for FSSI - Office Supplies (Feb. 6, 2007) (AR 285). The scope of this procurement was established by the RFQ, which limited the types of office supplies subject to the BPA to 13 subcategories, and specifically excluded certain items normally found in office supply catalogs. RFQ §§ B.2.4 & D.3.3.2 (AR 284, 312, 392).

On February 28, 2007, GSA held a pre-proposal conference with vendors, at which some of the issues surrounding this bid protest were discussed. Federal Acquisition Service Pre-proposal Conference (Feb. 28, 2007) (AR 358). GSA then issued Amendment 0001 on March 2, 2007, which extended the closing date from March 9, 2007 to March 30, 2007, and resulted in other minor changes. Amendment 0001 (AR 456-62). GSA issued Amendment 0002 on March 8, 2007. Amendment 0002 (AR 463). Amendment 0002 revised the quote sheet instructions and provided detailed procedures for submitting pricing information, as we discuss at length below. AR 464-5.

Vendors were encouraged to offer BPA prices that were better than prices offered to other Federal agencies. RFQ § C.2.8.10 (AR 288). Pursuant to the RFQ, BPA prices could not exceed the vendor's prices on the FSS. RFQ § D.3.3 (AR 304-5). Successful vendors entered into a one-year base period BPA, with two one-year option periods. RFQ § C.2.2 (AR 286).

The quotes submitted by the competing vendors were to clearly demonstrate an understanding of both the general and specific requirements of the RFQ and convey the vendor's capability for transforming its understanding into successful performance under a BPA order. RFQ § D.2.2 (AR 301). The agency demanded that bids must "be fully and completely in compliance with RFQ instructions." *Id.* According to the RFQ:

> The information requested and the manner of submission is essential to permit prompt evaluation of all quotes on a fair and uniform basis . . . Incomplete quotes will be considered non-responsive and will not be further evaluated.

*Id.* Contractors whose quotes were not considered or selected for a BPA would be notified and informed of the basis for nonselection. *Id.*

Scoring of Technical and Price Quote

The RFQ established a "best value" procurement, with evaluations to be conducted under Federal Acquisition Regulation (FAR) Part 8.4. RFQ § D.4 (AR 308). Vendors were required to submit both a technical and a price quote. RFQ § D.3 (AR 302-07). Pricing and technical evaluation scores were combined for a final score that would determine BPA recipients. RFQ § D.4 (AR 308); *see also* Best Value Award Decision Document § 2.0 (AR 3273, 3300). The agency would establish BPAs with vendors "whose quotes represent the best value to the Government." RFQ § D.4 (AR 308).

The agency evaluated Capitol Supply's technical submission on the four technical subfactors set out by the RFQ, ranking it ninth with a score of 245 out of a possible 300. Final Technical Evaluation Consensus For FSSI Office Supplies BPA (June 6, 2007) (AR 3293). This aspect of plaintiff's quote is not at issue in this protest.

The GSA's price evaluation methodology compared the bidders' prices with the prices of S.P. Richards (SPR), a leading wholesaler in the business products industry. RFQ § D.3.3.1 (AR 305). Section D.3.3.1 of the RFQ instructed vendors' quotes to state discounts off its current GSA FSS catalog prices and discounts "off the wholesaler's list price using the S.P. Richards catalog . . . . " *Id.* (emphasis in original). Each vendor's price quote was to be evaluated based upon the percentage discount offered off the SPR catalog. *Id*. However, there was no requirement to offer SPR products. *Id*. The agency relied on the SPR catalog prices for SPR products or their equivalents solely in order to establish a common reference or benchmark against which all bids could be compared. RFQ § D.4.1.2 (AR 309, 461, 3280-81).

Amendment 0002 Instructions

Central to the issues presented in this bid protest is the procedure for inputting data on a pre-formatted spreadsheet provided by the agency – the RFQ Quote Sheet. In order to activate the SPR price comparison data, it was essential to input certain information in a very specific format.

Amendment 0002, issued March 8, 2007, set forth detailed instructions for submitting the price data on the RFQ Quote Sheet. It outlined a 6-step procedure for

completing the quote, with special emphasis on items required for the pre-formatted RFQ Quote Sheet, which was attached to the RFQ. Amendment 0002 (AR 465). Below, a replication of an illustration of The Quote Sheet from the GAO Bid Protest Decision is provided. *In the Matter of Capitol Supply, Inc.*, B-309999.3, Jan. 22, 2008, 2008 CPD ¶ 35 at 2. The illustration is merely an example of the Quote Sheet, with the bottom row filled in with hypothetical data:

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Office Supplies sub-category (use pull down list) | Manufacturer name | Stripped manufacturer part number (Reference SPR catalog tab for correct format) | Current GSA schedule price ($) | Proposed BPA price ($) | Quantity per selling unit (for items NOT in "SPR Catalog" tab) | Item Description (for items NOT in "SPR Catalog" tab) | Unit of measure (for items in SPR catalog) | Quantity per selling unit (for items in SPR catalog) | Discount off current GSA schedule price (%) | SPR list price ($) | Discount off SPR list price (%) |
| Calendar | At-A-Glance | AAG47294 | $24 | $21 | | | EA | 1 EA | -13% | $27.39 | -23% |

After entering contact information, the vendor was instructed to review sub-category definitions. *Id*. Steps 1 and 2 explained that the vendor was required to be familiar with sub-categories in order to enter data into the Quote Sheet. *Id*. Under Step 2, for instance, the vendor was instructed to fill out the first column of the spreadsheet with the proper sub-category so the Government could easily categorize the item listed. *Id*.

The Quote Sheet contained 15,002 pre-formatted rows, designed to automatically populate cells 8 through 12 with the SPR catalog price, SPR discount, and other SPR data once the stripped manufacturer part number had been entered into cell 3. *Id*. Proper entry of the stripped manufacturer part number was critical to the Quote Sheet, hence the instructions in Step 3 to review them carefully. GSA provided the entire SPR catalog for reference:

> *STEP 3: REVIEW "STRIPPED MANUFACTURER PART NUMBERS"* – Review the list of "stripped manufacturer part numbers" in the "SPR Catalog" tab, since step 4 below requires that you enter part numbers for the office supplies items in your catalog in a very specific format. Note that the entire Q1 2007 S.P. Richards catalog is contained in the tab "SPR Catalog" for your reference.

*Id*. Step 3 required that stripped manufacturer part numbers be reviewed carefully and submitted in a specific format, and prohibited the vendor from submitting items that did not fit into the defined sub-categories from Step 2:

> However, as a point of clarification, in steps 4 and 5 below, you will be providing quotes for only those items in your catalog that fall into one of the defined Office Supplies Sub-Categories in the "Definitions" tab.

*Id.* The vendor was thus required to limit items in the Quote Sheet to those that were within the proper scope of the procurement. *Id*.

Step 4 precisely delineated how the vendor was required to enter data into the Quote Sheet. *Id.* The instructions reiterated the importance of correctly entering the stripped manufacturer part numbers, explaining that the numbers enabled the Quote Sheet to automatically populate with SPR data. *Id*. Step 4 explicitly stated that incorrect stripped manufacturer part number entries would invalidate the vendor's bid:

> These items must be listed by manufacturer name (in column 2) and "stripped manufacturer part numbers" (in column 3) . . . A complete list of "stripped manufacturer part numbers" (from the S.P. Richards catalog) can be found in the "SPR Catalog" tab. It is very important to correctly enter the "stripped manufacturer part number" since the information will be used to automatically lookup the S.P. Richards list price and other related information. Failure to correctly enter accurate "stripped manufacturer part numbers" will result in invalid quotes.

*Id.* The cited provision further explained that if the stripped manufacturer part number was not in the SPR catalog, "#N/A" would automatically populate:

> NOTE: FOR ITEMS ENTERED THAT ARE NOT IN THE S.P. RICHARDS CATALOG – Upon entering the specified information, you will notice that the columns designated "8," "9," and "11" will populate automatically (if the entered "stripped manufacturer part number" is contained in the S.P. Richards catalog). However, if the item entered in column 3 is not contained in the S.P. Richards catalog, an error ("#N/A") will appear in these columns.

*Id.* The vendor was instructed to deal with items that were not in the SPR catalog as follows:

> Disregard this error if the item entered is not contained in the S.P. Richards catalog, but is a valid manufacturer part number. In addition, be sure to enter the "Quantity per Selling Unit" in column 6 and "Item Description" in column 7 if the item entered is not contained in the S.P. Richards catalog.

*Id*. Steps 5 and 6, as detailed by the Amendment 0002, address actions after the critical step in the construction of the Quote Sheet and are not at issue here. *Id*.

<u>Capitol Supply's First Quote Sheet</u>

Capitol Supply submitted its Quote Sheet on March 2, 2007, in compliance with RFQ deadlines. Capitol Supply Response to RFQ (Mar. 2, 2007) (AR Q11932, Q18855-Q19546). The Quote Sheet contained 55,974 items. *Id.* An examination of the plaintiff's initial submission revealed that all of the items with automatically populated data, approximately 15,000 items, appear at the beginning of the Quote Sheet. AR Q18855-Q19035. For these 15,000 items, SPR data was automatically populated into cells 8 through 12. *Id.*; *see* Exhibit A (attached).

After those items, Capitol Supply apparently entered no data (resulting in a blank row), and then included 418 items with stripped manufacturer part numbers that were not in the SPR catalog. AR Q19035-Q19040. For these 418 items, "#N/A" automatically populated columns 8, 9, 11, and 12. *Id.*; *see* Exhibit B (attached).

At this point, the pre-formatted section of the Quote Sheet was exhausted. AR Q19040. However, Capitol Supply continued to enter part numbers, but no data automatically populated, purportedly because there was no corresponding item in the SPR catalog. *Id*. Accordingly, Capitol Supply entered the Quantity Per Selling Unit and the Item Description into columns 6 and 7 respectively, as instructed in Step 4. *Id.* For 977 items from Q19040 to Q19052, Capitol Supply entered stripped manufacturer part numbers that did not automatically populate either SPR data or "#N/A." *See* Exhibit C (attached).

After the 977 entries that did not automatically populate, a blank row was entered. AR Q19052. From the blank row on Q19052 to the end of the bid on Q19546, totaling 40,896 rows, we found that the stripped manufacturer part number entries were radically different. The majority of these rows were blank in column 3 – no stripped manufacturer part number was submitted. AR Q19052-Q19546. For the rows in which column 3 did contain data, the vast majority were numbers that lacked a three-letter manufacturer's prefix. *Id.*; *see* Exhibit D (attached). While every single stripped manufacturer part number contained a three-letter prefix in the pre-formatted section of the Quote Sheet, very few of the final 40,896 rows contained stripped manufacturer part numbers with three-letter prefixes, if they contained any data in column 3 at all.

AR Q19052-Q19546. Our investigation of the Administrative Record corroborates the Government's evaluation, discussed in the following section.

GSA's Consideration of the Initial Submission

On April 6, 2007, Julia Seebacher, a member of GSA's price evaluation team, contacted the contracting officer via electronic mail (e-mail) to inform her of problems with Capitol Supply's price quote format. AR 3045-46; *see* Consolidated Statement of Uncontroverted Facts (CSUF) 48-53, 65-66. Ms. Seebacher stated that Capitol Supply had added information beyond the pre-formatted rows in the table, and that the data entry beyond the 15,002 pre-formatted rows was "very sloppy," particularly the stripped manufacturer part numbers. AR 3045 ("It seems that in the majority of cases, they started to provide only the numeric portion and drop the manufacturer prefix portion of the Part #.").

Ms. Seebacher suggested one of two options. First, GSA could contact Capitol Supply to request that it copy the data beyond the pre-formatted portion of the Quote Sheet into additional spreadsheets, which would allow them to provide correct stripped manufacturer part numbers. *Id*. Noting that the data entry was satisfactorily completed in the pre-formatted section, she posited that the instant check provided by automatic population enabled Capitol Supply to enter the SPR catalog numbers correctly. AR 3045-46.

In the alternative, Ms. Seebacher suggested that GSA could simply disregard any items for which "#N/A" had appeared on the Quote Sheet (indicating items not listed in the SPR catalog). *Id*. She was concerned, however, that this approach might result in "cutting items that are actually in the SPR catalog but were not listed properly by the vendor." AR 3046. Consequently, the agency would be evaluating only 15,000 of the approximately 55,000 items in the quote. Ms. Seebacher confirmed her suspicion that the stripped manufacturer part numbers were not properly submitted by spot-checking several items for which she knew the correct manufacturer prefix; according to her e-mail, some of these items were in fact listed in the SPR catalog. *Id*. For those items, the erroneously entered data did not automatically populate cells 8 through 12 with SPR data. *Id*. Only through her own manipulation could she populate the Quote Sheet with SPR data. *Id*.

On April 7, 2007, the contracting officer responded by e-mail that she would discuss the options with her supervisor, and that "since they were on track on the first 15,000, we may consider getting a clarification from them to correct" the problem. AR 3045. The contracting officer also suggested that they could seek permission from Capitol Supply to fix the spreadsheet issue. *Id.* This last observation prompted Ms. Seebacher to respond on April 9, 2007:

> Just for clarification, the manufacturer part # provide . . . on the items in excess of the 15,000 item per table limit are incorrect (important vendor information is missing and the numbers are not properly stripped the way asked for). We cannot fix those numbers for Capitol. They either have to resubmit the items in the correct format (i.e. proper manufacturer part #s on all the items, not just the first 15,000) or we can only evaluate them on the first 15,000 correctly entered #s (i.e. items).

AR 3044. The contracting officer then directed the price evaluation team to set aside Capitol Supply's bid while she considered the best option. *Id*.

On April 25, 2007, in response to an e-mail from Ms. Seebacher outlining open issues for a number of the vendors, the contracting officer indicated that she was still awaiting approval to consider or disregard bids from vendors with problematic price submissions. AR 3049. She stated her concern that "[i]f we do go back to the contractors for price removal/correction, that may be considered negotiations," and acknowledged that she was "treading very carefully." *Id*.

<u>Clarification and Resubmission of Quote Sheet</u>

On May 14, 2007, the contracting officer contacted Capitol Supply via telephone. No record was kept of the contents of that telephone conversation. However, the contracting officer sent a confirmation e-mail message to Capitol Supply later that day. AR 3099. In the message, she advised that Capitol Supply would get the opportunity to clarify the information in its March 30 submission, as discussed during the teleconference. *Id*. However, the e-mail was somewhat ambiguous in identifying the problems with Capitol Supply's Quote Sheet. The contracting officer indicated only that the "information provided by Capitol Supply went beyond the allotted space on the quote sheet and did not follow the pre-formatted table." *Id*. She gave Capitol Supply until May 17, 2007, to resubmit the information. *Id*. The parties hotly dispute whether the conference discussed only the need to use the pre-formatted quote sheets for items exceeding 15,002, or whether it addressed the defective part numbers, as well.

<u>Capitol Supply's Second Submission</u>

Capitol Supply submitted a second price quote on or about May 17, 2007. Capitol Supply Pricing Clarification RFQ Quote Sheet (AR Q28365-Q30115). It copied and pasted the spreadsheet into four separate spreadsheet pages, with each page numbered through 15,002. *Id*. Capitol Supply's clarified price quote included 55,974 items. *Id*.

On May 22, 2007, Ms. Seebacher contacted the contracting officer by e-mail, informing her that Capitol Supply's clarification had only fixed some of its formatting problems. AR 3140-41. She explained that the plaintiff "simply copied the information from the original bid into the resubmitted tables without fixing any of the messed up Part

numbers listed in the original submission." *Id*. Specifically, Ms. Seebacher noted that of the 55,974 items, only 13,788 had correct stripped manufacturer part numbers that automatically populated columns 8 through 12 and were in the scope of the RFQ. *Id*. An additional 2,181 out-of-scope items had correct stripped manufacturer part numbers. *Id*.

A total of 40,005 items included no catalog pricing data "either because they are not in the SPR catalog or because the Part numbers provided by Capitol Supply are incorrect and cannot be used to lookup the item in the SPR catalog." *Id*. Consistent with the approach described earlier in her April 7 e-mail, Ms. Seebacher assured the contracting officer: "Based on a few (manual) spot checks several of the items that currently show up as N/A are actually in the SPR catalog but cannot be looked up because the Part numbers are messed up/ incorrect (for instance, missing/incorrect/ incomplete Manufacturer Prefix)." *Id.*

In light of the problem with the stripped manufacturer part numbers, Ms. Seebacher considered the agency's options for dealing with the plaintiff's bid. She presented the contracting officer with the following options: (1) permit Capitol Supply to clarify its bid again; (2) accept the bid as submitted, evaluating that portion of the submission with the appropriate information; or (3) eliminate Capitol Supply from further evaluation for the failure to comply with the RFQ's requirements or provide enough information for an accurate assessment of plaintiff's competitiveness. *Id*.

The Decision to Remove Capitol Supply From Further Evaluations

On May 22, 2007, the contracting officer directed that Capitol Supply was to be removed from further consideration for failing to follow the revised pricing structure. AR 3140. In an e-mail to Ms. Seebacher, the contracting officer wrote, "[i]t was incumbent upon [Capitol Supply] to correctly submit the information that was requested." *Id*. She added that the agency had no burden to advise Capitol Supply that the stripped manufacturer part numbers were submitted incorrectly, and that she nevertheless notified the vendor that the data submitted, from items 15,003 on, was incorrect. *Id*.

GSA's Award

GSA received 42 quotes by the closing date of March 30, 2007. AR Q1-104345. GSA rejected three vendors between March and May 2007 on the grounds that their quotes were non-responsive. AR 626-29, 1345. GSA requested clarification from nine vendors, including Capitol Supply. AR 3063. Three additional vendors were determined to be non-compliant without the possibility of clarification. *Id*.

After the agency's evaluation, 13 BPAs were awarded to vendors that demonstrated the best value for the Government. Best Value Award Decision Document (AR 3273-3303). The successful vendors were notified by e-mail on August 3, 2007, and letters sent the same day. AR 3304-69. Unsuccessful vendors who had not been

previously notified, including Capitol Supply, were notified by certified mail on August 3, 2007. AR 3382-83; *see also* AR 3370-81, 3384-3423.

Post-Award Protest

Capitol Supply sent GSA a Request for Explanation for Award Decision via e-mail on August 7, 2007. AR 3426. On August 30, 2007, GSA provided a written response to Capitol Supply's request, advising the vendor that its price quote was not prepared in accordance with the instructions incorporated into the RFQ by Amendment 0002. AR 3614-15. Specifically, the contracting officer stated that "[f]ailure to follow the pre-formatted table led to a failure to provide the S.P. Richards part numbers as required by the RFQ. Therefore, Capitol Supply's quote was not acceptable." *Id*.

On September 10, 2007, Capitol Supply filed an agency level protest and Freedom of Information Act (FOIA) request via e-mail to the contracting officer and GSA's FOIA officer. AR 3616-20. On October 5, 2007, GSA denied the agency protest. AR 3963-73.

Capitol Supply filed a protest to the Government Accountability Office (GAO) on October 15, 2007. AR 3974-79. GAO denied the protest on January 22, 2008, and held that the agency properly excluded from consideration Capitol Supply's quotation for failing to follow the solicitation's mandatory pricing instructions. *In the Matter of Capitol Supply, Inc.*, B-309999.3, Jan. 22, 2008, 2008 CPD ¶ 35.

On March 28, 2008, two months later, the plaintiff filed its complaint in this Court. The Government filed the Administrative Record on April 11, 2008. The parties filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1. Following the briefing, the parties filed a Consolidated Statement of Uncontroverted Facts on June 10, 2008. We heard oral argument on the cross-motions on July 14, 2008.

**DISCUSSION**

Standard of Review

This Court's jurisdiction over bid protest cases is prescribed by the Tucker Act, 28 U.S.C. § 1491(b)(1) (2000), as amended by the Administrative Disputes Resolution Act of 1996, Pub. L. No. 104-320, § 12(a), 10 Stat. 3870, 3874-75. Pursuant to that authority, we review procurement decisions of an agency under the standards of review set forth in the Administrative Procedures Act (APA), 5 U.S.C. §§ 701-706 (2000). *See* 28 U.S.C. § 1491(b)(4); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

The scope of review as defined by the APA is limited. In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), the U.S. Supreme Court stated:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

> with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Id.* at 416 (citations omitted). In applying this analysis, we consider whether: (1) the procurement officials exercised subjective bad faith; (2) there was a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated. *Metric Sys. Corp. v. United States*, 42 Fed. Cl. 306, 310 (1998) (citing *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1203-04 (Ct. Cl. 1974)).

In the present case, the protest focuses on the contracting officer's decision not to evaluate Capitol Supply's submission under the RFQ. According to the plaintiff, the following aspects of that decision were arbitrary and capricious: (1) the evaluator's conclusion that Capitol Supply had not filled out the quote sheet correctly; (2) the contracting officer's refusal to discuss that matter with Capitol Supply; and (3) the refusal to evaluate at least that portion of the proposal which the evaluator found contained the appropriate pricing information. Oral Argument Recording at 10:18 -19 a.m.

In this respect, we recognize that the agency is required only to provide "a coherent and reasonable explanation of its exercise of discretion and the disappointed bidder bears a 'heavy burden' of showing that the [challenged] decision had 'no rational basis.'" *Impresa*, 238 F.3d at 1333 (internal citations omitted); *Baird Corp. v. United States*, 1 Cl. Ct. 662, 664 (1983). Capitol Supply must establish more than a simple mistake on the part of the contracting officer; the plaintiff must prove that any error allegedly committed was so excessive as to fall beyond the decision-maker's ambit of discretion. *See Banknote Corp. of America, Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa*, 238 F.3d at 1332-33). This Capitol Supply has failed to do. However, before we address the merits, we must consider a proposed addition to the administrative record.

<u>Supplementation of the Administrative Record</u>

It has been described as a fundamental principle of reviewing agency action that "'[t]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). This Court and others have recognized several exceptions to the general rule that review is limited to the record that was before the agency at the time of the challenged decision. *See Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (quotations omitted); *see also Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345, 350 (1997) (reviewing factors which may support limited discovery or supplementation of the administrative record in bid protest context).

For instance, the Court may permit the parties to add to the formal record of a given procurement when it is necessary for a full and complete understanding of the issues, to fill in gaps concerning factors the agency considered, or to assist the Court in understanding an agency decision. *See Benchmade Knife Co., Inc. v. United States*, 79 Fed. Cl. 731, 736 (2007) and cases cited therein. Similarly, our Rules do not foreclose the possibility of supplementing the record where appropriate. *See* RCFC 52.1, Rules Committee Note ("[A]ny motion for correction or supplementation of the administrative record should be made on the basis of either the specific law to be applied in the particular case or generally applicable principles of administrative law.").

Capitol Supply moved to supplement the administrative record with a four-page declaration of its Chief Executive Officer, Robert J. Steinman, who was directly involved in the preparation of the plaintiff's quotation and in the subsequent clarifications between the plaintiff and the contracting officer. *See* Plaintiff's Motion to Supplement the Administrative Record (Apr. 28, 2008) ("Mot. to Suppl.") and attached Declaration (Apr. 25, 2008) ("Steinman Decl."). As a small independent dealer of office products, Mr. Steinman professes to be familiar with various distributors, such as S.P. Richards, and with the industry's use of alphanumeric codes to uniquely identify various products. Steinman Decl. at ¶ 4.

In his declaration, Mr. Steinman attempts to explain his initial misunderstanding concerning the RFQ's instructions. However, on the whole, Mr. Steinman's explanation is simply a criticism of the GSA's process. *See, e.g.*, *id.* at ¶ 5 ("I realized that the RFQ instructions were wrong, and the Quote Sheet was not asking for the manufacturer's part number, but rather the SPR distributor's catalog number . . . . "). The declaration makes it abundantly clear that there were certain practical limitations to the GSA's procurement scheme. In particular, the use of the S.P. Richards catalog prices as a benchmark could only get one so far. According to Mr. Steinman, the catalog only carried 28,722 items – approximately one-half of the 55,976 line items included in Capitol Supply's quote – and, therefore, "the maximum possible number of matchs (sic) was less than 28,722 under any circumstance." *Id.* at ¶ 8.

Even if these assertions are true, we find this evidence entirely irrelevant to the issues presented by this bid protest. Plaintiff's case is a *post*-award bid protest, challenging the GSA's decision to reject plaintiff's quote based on its determination that Capitol Supply submitted an improper quote under the terms of the RFQ. To the extent plaintiff objected to the type of information sought by the GSA, or to the required means of submitting that information, it should have filed a timely *pre*-award bid protest challenging the solicitation. Errors within a solicitation must be raised by a contractor prior to the closing date for receipt of bids, or they are waived. *See Blue & Gold Fleet,*

*L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007); *Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518, 533 n.7 (2007). All potential BPA contractors were told to carefully examine the solicitation and raise issues before it was too late to do so. *See* AR 380-81 ("If you see an obvious ambiguity in the solicitation you have a responsibility to let the Government know. Do not take the risk that oh well, I'll just wait and use it down the road.").

Additional information on stripped manufacturer part numbers is relevant only to the extent it describes the agency's rationale in excluding the quotes – Mr. Steinman's subjective observations have no bearing on the issue. At best, the plaintiff's proposed supplementation attempts to supply an after-the-fact justification for Capitol Supply's failure to comply with the strict requirements of the RFQ. It does not, as Capitol Supply argues, fill in a gap in the agency's record. Mot. to Suppl. at 4.

There is one other aspect of the declaration that merits our consideration. Specifically, Mr. Steinman claims that he "was not advised that there was any issue or concern with respect to its quotation other than formatting of its quotation onto four copies of the RFQ Quote Sheet spreadsheet." Steinman Decl. at ¶ 9. According to the declaration, "[n]o information was provided that suggested GSA had a problem with the part numbers in the Capitol quotation." *Id.* We reject this basis for supplementation, as well. As we discuss below, the contemporaneous documents speak for themselves on this point, and do not require elaboration from either party. **For these reasons we DENY plaintiff's motion to supplement the administrative record.**

<u>The GSA's Determination that the Initial Quote was Defective</u>

Plaintiff argues that the agency erred in not evaluating Capitol Supply's price quote, both after the clarifications – which we will discuss momentarily – and in the first instance. According to the plaintiff, Ms. Julia Seebacher, the agency's price analyst, "came to the unwarranted conclusion that Capitol Supply's entry of all the items in the RFQ Quote Sheet beyond those that automatically populated columns 8 through 12 was erroneous." Pl. Br. at 18-19. This argument has no merit. However one chooses to characterize Ms. Seebacher's conclusions, or the contracting officer's response to those conclusions, they are anything but arbitrary and capricious. Both officials acted well within their discretion.

Rather than evaluate the March 30, 2007, submission, Ms. Seebacher noted that only 15,000 of the approximately 55,000 items in Capitol Supply's quote could be evaluated effectively because the full slate of items could not fit on the allotted number of rows in the provided spreadsheet table. Seebacher e-mail (Apr. 6, 2007) (AR 3045-46). After diagnosing the problem, Ms. Seebacher observed that she might have been able to "simply add the SPR catalog lookup function to the additional rows and theoretically everything is fine and we did not change their bid." AR 3045. However, she could not resort to this remedial measure since Capitol Supply "got very sloppy in entering Manufacturer Part #'s once they did not have the instant control mechanisms of the table"

to indicate whether a given item is in the SPR catalog. *Id.* The plaintiff had omitted the manufacturer's prefix portion of the part number. Short of altering the quote, the agency had only two options: return the quote to Capitol Supply for revision or "simply disregard any items currently showing up as N/A (i.e. not in SPR)." AR 3046. Ms. Seebacher was reluctant to pursue the latter option because "[t]his might mean cutting items that are actually in the SPR catalog but were not listed properly by the vendor." *Id.*

Because Ms. Seebacher acknowledged that Capitol could have concluded that these items were not in the S.P. Richards catalog, argues the plaintiff, she should not have elevated this issue to the level of a nonresponsive RFQ. Since the RFQ instructed the vendors that the error message "#N/A" would appear where the part number had no match, and that this result was permissible, the analyst could not have known that the item was incorrectly entered merely by the absence of data in the SPR look-up fields on the spreadsheet. Therefore, under plaintiff's postulation, the submission should have been evaluated in its original form, irrespective of the fact that certain deficiencies were later confirmed by the plaintiff's clarification.

If we understand this argument correctly, the plaintiff faults the GSA price evaluation team for giving Capitol Supply the opportunity to better its chances during the price evaluation phase of the BPA selection process. This theory completely ignores the fact that plaintiff's submission could not be ranked beyond the first of four spreadsheets because Capitol Supply exceeded the capacity of the quote spreadsheet provided by the agency. Capitol Supply later conceded that it was guilty of this oversight, and was apparently satisfied with the agreed upon remedy. If the agency determined that this was indeed an easily correctable oversight, then the proper course was to pursue a revised submission rather than conduct a comparative price evaluation with such a small representative sample of plaintiff's product prices.

The plaintiff's full compliance argument is not only illogical, it is disingenuous. Capitol Supply implies that the evaluators must have ignored the most logical conclusion – that there was no equivalent item in the S.P. Richards catalog for items without the manufacturer part number – and instead assumed that the information was improperly omitted.

However, the administrative record answers this proposition. Beyond the mere possibility that S.P. Richards data was missing, the pricing data was incorrectly submitted. As Ms. Seebacher clarified in a follow-up e-mail to the contracting officer, after the first 15,000 entries "important vendor information is missing and the numbers are not properly stripped the way asked for." Seebacher e-mail (Apr. 9, 2007) (AR 3044). It was readily apparent that the plaintiff simply ignored the proper formatting procedures once the maximum capacity of the spreadsheet was exceeded. In omitting the prefix information on the part numbers and including only the numeric portion, the spreadsheet could not achieve the desired result of activating the S.P. Richards lookup function.

AR 3045. This feature of the GSA's formatted table was an essential control. And it is implausible that the plaintiff failed to appreciate this fact, given the detailed 6-step procedure outlined within the RFQ Quote Sheet instructions of Amendment 0002.

Contrary to the plaintiff's contention, the agency personnel did not make any unwarranted assumptions. While the evaluator did acknowledge the theoretical possibility that there might have been not one corresponding S.P. Richards product for the vast majority of Capitol Supply's 40,000 quoted items, she obviously considered it highly unlikely. Accordingly, as the administrative record indicates, the evaluation team conducted manual spot checks of certain entries. Through this admittedly non-exhaustive investigation, the team uncovered several instances in which an item offered by Capitol Supply, and also contained in the S.P. Richards catalog, appeared on the plaintiff's quote sheet without a corresponding manufacturer part number, or in some cases, appeared with a part number which had been recorded in an improper form.
AR 3140-41; *see* AR 3046 (using correct manufacturer prefix for certain items yielded SPR catalog product).

<u>Request for Clarifications</u>

In response to Ms. Seebacher's recommendations, the contracting officer determined that she would contact Capitol Supply directly and give the company an opportunity to correct the administrative flaws in its quote. The record indicates she sought "clarifications" from several vendors on this and other issues. AR 3045. We note that the contracting officer was not obligated to do so. Every vendor was on notice that "the manner of submission is essential to permit prompt evaluation of all quotes." RFQ § D.2.2 (AR 301). More importantly, the terms of the RFQ permitted the GSA to "eliminate a contractor from consideration ... without discussions," RFQ § D.5.2, and to treat incomplete or partial quotes as nonresponsive without further evaluation. RFQ §§ D.2.2 & D.3.3 (AR 301, 309); *see also* Transcript of Pre-proposal Conference (AR 382) ("[D]o not assume that you're going to get a second bite at the apple. Translation: Award without discussion could happen.").

Notwithstanding the clear language of the RFQ, the plaintiff suggests that the contracting officer was obligated to identify, discuss and resolve the alleged errors prior to removing them from the competition. Pl. Br. 21-22. Plaintiff offers no authority for this proposition, nor does the plaintiff even address the regulations governing this procurement at 48 C.F.R. § 8.404.

As a corollary to this argument, Capitol Supply posits that the contracting officer misled Capitol Supply during clarifications. According to the plaintiff, "[b]y focusing solely on the spreadsheet formatting issue, the Contracting Officer implied that there were no other issues with the Capitol quote." Pl. Br. at 22. Again, the *legal* theory is given exceedingly sparse treatment in Capitol Supply's papers. Moreover, the sole evidence offered in support of this allegation is found in Mr. Steinman's declaration, which we have excluded.

The Government rebuts the plaintiff's evidence by reference to the contracting officer's statement of facts, prepared and submitted in the course of Capitol Supply's bid protest before the GAO. We choose not to rely on post-dispute characterizations of the agency's clarification attempt, whether they be the plaintiff's or the defendant's recollections. Although the GAO report is technically part of our "administrative record," the contemporaneous record is sufficient for our purposes. Both parties agree that there was a teleconference between the contracting officer, Mr. Steinman and Mr. Harris, the morning of May 14, 2007, on the topic of Capitol Supply's March 30, 2007, submission. We know from a follow-up e-mail sent at 11:40 a.m. that same day from the contracting officer to Capitol Supply that more than one deficiency in the quote had been addressed:

> Per our conversation this morning, GSA is allowing Capitol Supply an opportunity to clarify the information submitted March 30, 2007 for RFQ #189760.
>
> As stated, information provided by Capitol Supply went beyond the allotted space on the quote sheet *and did not follow the pre-formatted table*. Please resubmit the requested information in the pre-formatted spreadsheet provided to you, along with the RFQ, no later than 3:00 p.m. Thursday, May 17, 2007.

AR 3099 (emphasis added). The contracting officer closed the letter with the promise that she and her associates remained available to address any questions or concerns. The next contact the contracting officer had with the gentlemen was a faxed response that same day followed by a revised submission on May 17 with the pricing information broken down on four separate copies of the RFQ Quote Sheet. It does not appear that the plaintiff revised any other aspects of its original submission. AR Tab 94 at 3100; CSUF 64.

Based on this record, we see no impropriety in the contracting officer's attempt to clarify the clerical and administrative errors evident in the plaintiff's submission. The Government concedes that the contracting officer was necessarily vague in its clarification attempt. CSUF 68; *see* Def. Br. at 38 (contracting officer did not use the specific words "stripped manufacturer part number."). As the contracting officer stated in an e-mail concerning pricing information for Capitol Supply and other bidders, she was "treading very carefully," fully aware that she could not address certain corrections as "that may be considered negotiations." Nicholson e-mail (Apr. 25, 2007) (AR 3049). Accordingly, the plaintiff has failed to demonstrate that the contracting officer abused her discretion or acted in an arbitrary and capricious manner.

<u>Capitol Supply's Revised Quotation</u>

Upon reviewing the revised and resubmitted quote, the evaluation team realized that Capitol Supply had not altered the substantive information within the spreadsheet. As directed, the plaintiff had divided its quote onto four spreadsheets as directed so that

all items were listed within the pre-formatted pricing table. However, on May 22, 2007, Ms. Seebacher noted in an e-mail to the contracting officer:

> Unfortunately, this did not solve our problem evaluating their RFQ response, because Capitol Supply simply copied the information from the original bid into the resubmitted tables without fixing any of the messed up part numbers listed in the original submission. It seems they were not aware that they were supposed to correct these Part Numbers in a way that allows us to properly look the items up in the SPR catalog.

AR 3140-41. For the same reasons first identified by the evaluation team, the plaintiff's quotation did not comply with Amendment 0002 of the RFQ. The plaintiff even in this litigation contends that its quotation meets the RFQ's requirements and could have been evaluated with an acceptable level of accuracy, despite the small percentage of S.P. Richards matches among its quoted items. We have carefully considered plaintiff's position, as well as the contrary conclusions reached by the GSA, and later the GAO. There is simply no support for the argument that the plaintiff complied fully with the RFQ.

In fact, the manner in which Capitol Supply has carried on this litigation confirms that the plaintiff does not actually believe its submission was valid. Throughout the briefing of this case, the plaintiff has attempted to educate the Court on the significance of the "stripped manufacturer part number," mostly in an attempt to explain plaintiff's original noncompliance as a simple misunderstanding. *See, e.g.*, Pl. Reply at 3 ("It is clear that GSA did not realize that the 'stripped manufacturer part number' used by GSA is not the part number used by the manufacturer or by other distributors, but was unique to the S.P. Richards catalog."); *see also* Mot. to Suppl. at 2 (plaintiff argues that the declaration "supplements the extremely limited explanation of the contracting officer's concerns with the manufacturer part numbers in plaintiff's quote by providing insight into the manner in which plaintiff dealt with those part numbers in preparing the quote."). These explanations provide no defense for a submission that was nonconforming even after a second opportunity to submit the quote was permitted.

Capitol Supply has raised several concerns in this case respecting the utility of the S.P. Richards benchmark. In particular, the plaintiff has developed a case that the agency's understanding of what constitutes a manufacturer part number is erroneous, or at least is different than the industry-wide understanding of that term. However, judging by the number of bids that made it to the evaluation stage, there is a substantial segment of the office products industry that had no difficulty in deciphering the RFQ's use of the term. The plaintiff has stressed defects in a scheme that matched products with a distributor's catalog where packaging and available quantities for similar products may not match up and could skew the results of the price comparison. *See* Pl. Reply at 4-5. The plaintiff chose to rely on its own interpretation of the formatting requirements and hope that the contracting officer's view comported with that interpretation.

Having found the second submission defective, we turn to the more important inquiry – whether the contracting officer's refusal to evaluate the quote was arbitrary, capricious, an abuse of discretion and not in accordance with law.

“Arbitrary and Capricious” Standard Applied to Contracting Officer's Exclusion of Plaintiff's Revised Quotation

In applying the “arbitrary and capricious” standard of Section 706, we test whether the agency considered all relevant factors and articulated “a rational connection between the facts found and the choice made.” *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 358 (2004). Accordingly, the key to determining whether the Court should reverse the agency's decision is to look not at the decision alone, but at how the agency arrived at the decision. *See Overton Park*, 401 U.S. at 416 (inquiry limited to “whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.” ); *see also TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327 (Fed. Cir. 1996) (an agency's decision not to be disturbed unless the decision is “wholly without reason”). A careful examination of the administrative record demonstrates that the contracting officer's actions in this procurement easily satisfy this standard.

The post-clarification e-mail exchanged between the contracting officer and the price evaluation analyst is especially instructive. Because the last re-submitted quote had not been substantively altered but merely copied onto pre-formatted spreadsheets, the evaluation team still faced the following problems, as reported by Ms. Seebacher in her May 22 e-mail to the contracting officer:

- Capitol Supply's RFQ response lists 55,974 items, but less than 25% (13,788) can be looked up in the SPR catalog and are in scope of this RFQ. Once we apply the 90% trim to these items, we will effectively be evaluating only 22% of all items proposed by Capitol Supply.

- An additional 2,181 items can also be looked up in the SPR catalog, but they are not in the scope of this RFQ (such as Office Furniture items, Break Room supplies, and janitorial supplies) and thus, will not be included in the price evaluation.

- 40,005 items cannot be looked up in the SPR catalog, either because they are not in the SPR catalog, or because the part numbers provided by Capitol Supply are incorrect and cannot be used to lookup the item in the SPR catalog.

- Based on a few (manual) spot checks several of the items that currently show up as N/A are actually in the SPR catalog but cannot be looked up because the Part numbers are messed up/incorrect (for instance, missing/incorrect/incomplete Manufacturer Prefix).

AR 3140-41.

Then, in the same e-mail, Ms. Seebacher sought the contracting officer's next course of action based on several alternatives which she articulated clearly. First, she suggested that the contracting officer might want "to ask Capitol Supply again (specifically) to correct their part numbers." *Id.* She noted in regard to this option, "we should consider that other vendors also got some part numbers wrong and did not get a first or even second chance to correct their bid," and "going back to Capitol Supply will again delay the competition of the price evaluation in General Office Supplies and Paper." *Id.* However, Ms. Seebacher also suggested that the contracting officer consider "whether we want to proceed with their bid as is." She further advised that, "[w]ith regard to [this] option, it might make sense to evaluate Capitol Supply based on the items they listed correctly to see how they rank, but to keep in mind that we evaluate them only on a small portion of their total bid, which might not accurately reflect their competitiveness (in a positive or negative way)." *Id.* "Lastly," she continued, "we can simply eliminate them from the evaluation because they did not provide enough information for us to accurately evaluate their RFQ response and competitiveness." Ms. Seebacher noted parenthetically, "[b]esides, they did not follow instructions in various ways, by proposing items clearly not in scope of this RFQ such as toilet paper dispensers, and by listing a large number of Part numbers incorrectly." *Id.*

In response to the e-mail, the contracting officer made the following determination:

> Capitol Supply can be removed from further evaluations. It was incumbent upon them to correctly submit the information that we requested. I did not have to advise them that the part numbers were incorrect. I advised them that after the first 15,003, there [sic] information was incorrect. Therefore, since they did not follow the instructions of the revised pricing structure we can sufficiently defend our case by removing them from further consideration.

AR 3140; *see also* AR 3151.

Although the contracting officer did not articulate it as a part of her rationale, the conclusion that the plaintiff supplied incorrect information in its quote is also supported by the number of out-of scope items in the quote sheet. Ms. Seebacher mentioned this problem in several of her e-mail exchanges with the contracting officer. *See, e.g.*, AR 3141 ("An additional 2,181 items ... are not in the scope of this RFQ (such as Office Furniture items, Break Room supplies, and Janitorial supplies) and thus, will not be included in the price evaluation."). Only later did the true extent of these responsiveness

issues become apparent. According to the Government, 13,092 items in Capitol Supply's Quote Sheet were out of scope. Defendant supplied this information in an appendix to a brief, and concedes that these figures are not contained within the administrative record. While the contracting officer and Ms. Seebacher mentioned the problem of out-of-scope items in their correspondence, it was not a primary reason for the dismissal of Capitol Supply's bid. AR Tab 113. Nor is it for us.

Everything about the cited correspondence exemplifies reasoned decision-making, from the straightforward statement of the alternatives and consideration of their consequences, to the reluctance to make a snap decision. Under the circumstances, plaintiff is hard-pressed to demonstrate that the agency's chosen course of action was either irrational or unreasonable, a necessary predicate for judicial intervention. *Baird Corp*., 1 Cl. Ct. at 664.

Plaintiff simply disagrees with the course of action chosen by the contracting officer. The RFQ explicitly warned contractors that incomplete quotes would be deemed non-responsive and would not be evaluated. AR 301. Pursuant to the RFQ, the agency was "not obligated to conduct discussions and may eliminate a contractor from consideration or award a BPA without discussions if deemed appropriate." AR 309; CSUF 32. Had the contracting officer entered into discussions with Capitol Supply, she would be obliged to do so with the remaining vendors competing for a BPA. *See* 48 C.F.R. § 1.602-2(b) (providing for impartial, fair and equitable treatment of bids). For that reason, the contracting officer was wise in "treading very carefully." AR 3049.

The contracting officer also could have sent plaintiff's quotation for evaluation as is. As Ms. Seebacher advised on several different occasions, however, under this approach only a small portion of plaintiff's total bid could be evaluated. *See* AR 3046, 3050, 3140-41; *see also* CSUF 29 ("Items that did not match to the SPR Catalog or were not within the scope of the RFQ were not utilized in the price evaluation in any way."). The plaintiff was not entitled to have any portion of its quotation considered unless all items are submitted in the proper form. *See* RFQ § D.3.3 (AR 304) ("The price submission must address all requirements as partial submissions may be rejected.").

On this point, we agree with the conclusion reached in the GAO protest. Had the agency evaluated the plaintiff's price quote based solely on the data correctly entered, it would "provide a benefit to Capitol Supply that other vendors did not have." *In the Matter of Capitol Supply, Inc.*, B-309999.3, Jan. 22, 2008, 2008 CPD ¶ 35 at 5. First, the contracting officer would have improperly relaxed a mandatory requirement of the RFQ for one contractor and not others. Secondly, in overlooking the strict formatting requirements the agency could give a competitive advantage to a vendor who chooses to "opt out of the baseline evaluation by not providing the proper stripped manufacturer numbers for items in the SPR catalog." *Id.* at 5-6 (recognizing that Capitol Supply could – there is no indication it did – decide which method of identifying items yielded more advantageous price evaluation).

The decision reached is certainly within the "zone of acceptable results," particularly given that the result provided for in the RFQ. *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 655 n.8 (2002); *see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974) (in reviewing agency decisions, the Court cannot substitute its judgment for that of the agency); *see also R&W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003).

## CONCLUSION

In this particular procurement scheme, form was as important as substance in order to provide a means of comparing discounts across a broad spectrum of products and among a large number of participating vendors. As the RFQ stated, "[t]he information requested and the manner of submission is essential to permit prompt evaluation of all quotes on a fair and uniform basis." RFQ § D.2.2 (AR 301).

There is no question that in submitting its quotations the protestor failed to comply with the specific requirements of the RFQ, in particular the detailed instructions of Amendment 0002. The price evaluation team correctly identified the errors and brought those items to the contracting officer's attention prior to completing an evaluation. Based on the administrative record, we find that the contracting officer acted within her discretion during the clarification process with Capitol Supply's principals and in her response to the persistent errors in Capitol Supply's submission.

The administrative record demonstrates that the contracting officer excluded plaintiff's quotation from further consideration pursuant to the provisions of the RFQ, and only after a full and fair consideration of relevant factors and alternative courses of action.

**Accordingly, we DENY the plaintiff's motion to supplement the administrative record in this matter. Furthermore, pursuant to RCFC 52.1(b), we DENY the plaintiff's motion for judgment on the administrative record and GRANT the defendant's cross-motion. The Clerk of Court is directed to enter judgment in favor of the defendant.**

**Based upon the Court's Order at the July 14 Oral Argument, none of the information in this Opinion or in the parties' briefs, is subject to the Protective Order.**

**IT IS SO ORDERED.**

s/ Lawrence M. Baskir
LAWRENCE M. BASKIR
Judge

Attachments (Exhibits A-D)